CHARLES F. ROCHE III ET AL. v. TOWN OF FAIRFIELD

HEALEY, PARSKEY, ARMENTANO, SHEA and WRIGHT, Js.

Argued December 4, 1981—decision released March 23, 1982

*Thomas J. Dolan,* with whom, on the brief, was *Edward V. Barrett,* for the appellants (plaintiffs).

*Noel R. Newman,* with whom was *Kenneth B. Povodator,* for the appellee (defendant).

ARTHUR H. HEALEY, J. This is an action for injunctive relief brought by the plaintiffs seeking to enjoin the defendant, town of Fairfield, from "trespassing upon or otherwise using" beach property allegedly owned by the plaintiffs.[1] The plaintiffs, Charles F. Roche III, Nancy Roche and Michael Trotta, are owners of two separate parcels of land, presently physically bounded on the south by Long Island Sound, in Fairfield (see plaintiffs' exhibit set out in appendix to opinion). The plaintiffs have appealed from a judgment for the defendant.

For many years prior to 1930, the plaintiffs' properties were bounded southerly by Pine Creek, a navigable estuary of Long Island Sound. The creek was separated from the Sound by a sand spit or peninsula which ran parallel to the shore and extended as far as the plaintiffs' properties.[2] The spit acted as a barrier protecting the mainland shore from the Sound.

---

[1] The plaintiffs also claimed monetary damages but presented no evidence of such damages at trial.

[2] The sand spit, although relatively narrow, was wide enough to allow for several cottages.

Both plaintiffs' premises are portions of a six-acre tract of land which a common predecessor in title received in 1896 and which tract was described as being bounded on the south by Long Island Sound. This tract was later subdivided into smaller parcels, two of which the plaintiffs presently own. Trotta received title to his premises in 1947 in a deed which described his property as bounded on the south by Pine Creek. The Roches received title to their premises[3] in 1976 in a deed which also described their property as bounded on the south by Pine Creek.[4]

In 1938, a storm washed away the westerly end of the sand spit which existed south of Pine Creek and which was the southerly boundary of that creek, and which spit had as its southerly boundary Long Island Sound. In 1950, another storm further destroyed another portion of the sand spit leaving an island, and another storm in 1955 destroyed the remaining portion of the sand spit which was located in front of the plaintiffs' premises. As of 1960, the sand spit, as it had existed in front of the plaintiffs' properties, was completely destroyed so that the plaintiffs' properties fronted directly on Long Island Sound. The sand spit, which had previously defined the boundaries of Pine Creek, had been completely inundated to a point east of the plaintiffs' properties leaving only a sandbar which appeared at low tide.

Between the 1955 storm and the mid-1960s, sand accumulated so that the beach in front of the plain-

---

[3] The Roche property is located some 100 yards to the west of the Trotta property near the end of South Pine Creek Road. South Pine Creek Road runs north to south and ends at the waterfront.

[4] In August, 1976, the Roches deeded the same premises to themselves with the new deed using a surveyor's description which stated that the property was bounded by Long Island Sound.

tiffs' properties grew to some 200 feet. This beach extended to Long Island Sound over what had formerly been the bed of Pine Creek. In 1967, the town obtained easements[5] from the affected property owners, including the Roches (but not Trotta), for the construction of a dike as part of a flood control project. The dike was located substantially in the center of what had formerly been Pine Creek. The title to the beach area between the plaintiffs' original southerly boundary and the Sound is the subject of the present dispute.

Since 1959, the town, through its recreation commission, has maintained a lifeguard station at a public beach called South Pine Creek Beach which includes the 200 feet of beach area in front of the plaintiffs' properties[6] and extends to a wooden bulkhead located east of the plaintiffs' properties. The public beach was operated every day from Memorial Day to Labor Day and on weekends in September of each year. The lifeguards would patrol the beach area daily and their duties included safeguarding bathers, giving swimming lessons and prohibiting fishing, dogs and alcoholic beverages from the premises. The area patrolled included the beach in front of the plaintiffs' premises up to a wooden bulkhead east of their properties. The parks department has regularly cleaned the beach area once or twice a week during the summer months since 1959.

In the fall of 1976, Roche placed stones, as markers, along his easterly boundary line to the high-water mark of Long Island Sound. The town,

[5] Some of the easements were voluntarily obtained while others were received by condemnation.

[6] There was also some evidence that the public beach was, in fact, operating as early as 1950 or 1951.

in 1977, removed some of the stones and Roche, threatened with arrest, removed the rest of the stones. Roche, claiming ownership of the beach area in front of his property, wrote to the first selectman and the department of public works advising them to keep off his land and that he did not need their assistance in maintaining his property.

The plaintiffs brought this action for injunctive relief and damages for trespass on the land in front of their properties maintaining that their title extends to the high-water mark of Long Island Sound by virtue of the doctrine of accretion. The defendant denied the plaintiffs' title by accretion and raised the alternative special defenses of adverse possession, prescriptive easement and implied dedication. The trial referee held that an avulsion, and not accretion, had occurred and that the plaintiffs had failed to prove their title to the area in dispute. The referee also found that even if the disputed land did belong to the plaintiffs, the defendant would have obtained either title to the land by adverse possession or a right of way to use the land by prescriptive easement.[7]

## I

The plaintiffs' first claim is that the referee erred in finding that the beach area in dispute in front of the plaintiffs' property was created by an avulsion rather than by accretion. We agree. "On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. See Practice Book, 1978, § 3060D. This involves a two part function: where the legal conclusions of

[7] The referee did not reach the defendant's alternative defense of implied dedication.

the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Footnote omitted.) *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

Accretion is defined as "[a]ddition of portions of soil, by gradual deposition through the operation of natural causes, to that already in possession of the owner." Black's Law Dictionary (5th Ed.); see 5 Powell, Real Property (1981) ¶ 719; 5A Thompson, Real Property (1970 Sup.) §§ 2560-2564. Avulsion is defined as "[a] sudden and perceptible loss or addition to land by the action of water, or a sudden change in the bed or course of a stream . . . . The removal of a considerable quantity of soil from the land of one man, and its deposit upon or annexation to the land of another, suddenly and by the perceptible action of water." Black's Law Dictionary (5th Ed.); see 5 Powell, Real Property (1981) ¶ 719.

"[T]he owner of waterfront property is benefited in title by whatever may be joined to his land, above the high-water mark, through accretion. *Rochester* v. *Barney,* 117 Conn. 462, 468, 169 A. 45 [1933]." *Short Beach Cottage Owners Improvement Assn.* v. *Stratford,* 154 Conn. 194, 200, 224 A.2d 532 (1966); see *Welles* v. *Bailey,* 55 Conn. 292, 316, 10 A. 565 (1887); see also *Lockwood* v. *New York & New*

*Haven R. Co.*, 37 Conn. 387, 391 (1870). Where a change occurs suddenly and perceptibly by avulsion, however, boundaries and title to land are not affected. 78 Am. Jur. 2d, Waters § 411; see *Missouri v. Nebraska*, 196 U.S. 23, 35, 255 S. Ct. 155, 49 L. Ed. 372 (1904). The trial referee found that "[t]he evidence clearly indicates that the sand spit in front of their properties was destroyed by three storms occurring in 1938, 1950 and 1955, and that the changes were a sudden and perceptible loss of the spit resulting immediately from the storms . . . . The changes of the northerly bound of the Sound occurred on the days of each storm and were complete on those days, portions of Pine Creek disappeared instantly on those days and the shore line of the Sound suddenly and perceptibly became the shore line as it presently exists, during the storms. What had been Pine Creek suddenly and perceptibly became Long Island Sound. What occurred in the present case constituted an avulsion."

While this finding adequately deals with the title and boundaries to the sand spit, it sheds no real light on the status of the title to that portion of the beach area in front of the plaintiffs' properties. There was no evidence that this disputed beach area itself was created by an avulsion. There was also no evidence, even though the defendant seems to claim otherwise, that the disputed beach area was, in reality, the first submerged, now reemerged sand spit.[8] It does appear, however, that there was sufficient evidence presented at the trial to establish, by a preponderance of the evidence, the plaintiffs' title to the disputed beach area by accretion.

---

[8] In both of those instances, since title to land is unaffected by an avulsion, the disputed beach area would arguably belong to the defendant. 78 Am. Jur. 2d, Waters §§ 411, 421; 93 C.J.S., Waters § 81.

Margaret Raso, Trotta's daughter, testified that after the 1950 hurricane, the beach area directly in front of the plaintiffs' properties (or their predecessors) gradually increased over the years due to the shifting of sand caused by the currents. George Chicos, a local resident and former town employee, also testified that the disputed beach area gradually built up with sand and filled in what was once Pine Creek. Frank Daniels, engineer for the town of Fairfield, testified that the beach area in dispute gradually built up with sand, over the years from 1950 to 1970, due to the action of the tides and winds. The testimony of those three witnesses on the subject of accretion was uncontroverted.

Therefore, the trial referee's determination that the disputed beach area was created by an avulsion was clearly erroneous. See *Hall* v. *Planning Commission,* 181 Conn. 442, 435 A.2d 975 (1980). It was the gradual and imperceptible actions of the Sound over the years from 1950 to 1970 which formed the beach area in front of the plaintiffs' properties and not a sudden and perceptible loss or addition to the land by the action of the water. Since the plaintiffs' southerly boundary line was extended by the doctrine of accretion, the plaintiffs held title to the beach area in dispute to the high-water mark of the Sound. *Short Beach Cottage Owners Improvement Assn.* v. *Stratford,* supra, 200; *Rochester* v. *Barney,* supra, 468.

## II

Since we have found that the disputed beach area was owned by the plaintiffs, we will now consider the defendant's first special defense which is title by adverse possession.

The trial referee found that the defendant did obtain title by adverse possession to the disputed beach area "in that the owners were ousted of possession uninterruptedly for more than fifteen years by an open, visible and exclusive possession of the Town under a claim of right and without consent or because of the owner." The plaintiffs have claimed that the referee erred in holding as it did on the grounds that (1) adverse possession requires more than a showing of occasional, unorganized, and nonexclusive use by the general public and (2) the defendant's actions, if upheld, constitute an unlawful taking of private property without compensation and due process of law.

"Where title is claimed by adverse possession, the burden of proof is on the claimant. *Loewenberg* v. *Wallace,* 147 Conn. 689, 699, 166 A.2d 150 (1960). The essential elements of adverse possession are that the owner shall be ousted from possession and kept out uninterruptedly for fifteen years under a claim of right by an open, visible and exclusive possession of the claimant without license or consent of the owner. *Stevens* v. *Smoker,* 84 Conn. 569, 574, 80 A. 788 (1911). The use is not exclusive if the adverse user merely shares dominion over the property with other users. *Short Beach Cottage Owners Improvement Assn.* v. *Stratford,* 154 Conn. 194, 199, 224 A.2d 532 (1966). Such a possession is not to be made out by inference, but by clear and positive proof. *Robinson* v. *Myers,* 156 Conn. 510, 517, 244 A.2d 385 (1968). In the final analysis, whether possession is adverse is a question of fact for the trier. *Padula* v. *Padula,* 138 Conn. 102, 110,

82 A.2d 362 (1951)." *Whitney* v. *Turmel,* 180 Conn. 147, 148, 429 A.2d 826 (1980). "The doctrine of adverse possession is to be taken strictly." *Huntington* v. *Whaley,* 29 Conn. 391, 398 (1860).

The plaintiffs' claim that the defendant's assertion of title by adverse possession must fail because the trial testimony demonstrated use of the disputed beach area only by the unorganized public. They allege that under *Mihalczo* v. *Woodmont,* 175 Conn. 535, 400 A.2d 270 (1978), this type of use is insufficient to establish the defendant's title. In *Mihalczo,* supra, members of the general public used the owners' seawall, which was adjacent to a beach, for a walkway. The borough of Woodmont claimed, among other things, a prescriptive easement over the walkway. We ruled that the borough itself could not, in that particular case, satisfy the requirements for such an easement because it could not show that it held title under a claim of right. That is not the situation in this case.

The trial referee found that this "was an organized, planned use by the Town itself, designed for the recreational activities of those members of the public who saw fit to use it." In their brief the plaintiffs argue that "[t]he only use established by the testimony taking place in the disputed area is the periodic cleaning and unorganized sunbathing and swimming of the general public." We have recognized that the unorganized public cannot acquire rights by prescription. A deed to the unorganized public by that name would be void for uncertainty as there can be no prescription where there can be no grant. *Michalczo* v. *Woodmont,* supra, 541; see *Turner* v. *Selectmen of Hebron,* 61 Conn. 175, 187, 22 A. 951 (1891) ; *Claudio* v. *Village*

*of Greenport,* 55 Misc. 2d 371, 376, 284 N.Y.S.2d 965
(1967). The adverse user here, however, is not
asserted by the unorganized public but by and
through the defendant, as disclosed by the evidence.
Cf. *B. W. & Leo Harris Co.* v. *Hastings,* 240 Minn.
44, 59 N.W.2d 813 (1953).[9] "A municipality, like an
individual, may acquire title by adverse possession,
where the elements necessary for the establishment
of such a right are present, and when the adverse
possession may be deemed to be the official act of
the municipal corporation." 10 McQuillin, Munici-
pal Corporations (3d Ed.) § 28.15, p. 36.[10] "Clearly,
title by adverse possession may be acquired by the
United States, or by a state, a county, city or
other governmental entity." 3 Am. Jur. 2d, Adverse
Possession § 139; see *Nearing* v. *Bridgeport,* 137
Conn. 205, 75 A.2d 505 (1950); annot., 18 A.L.R. 3d
678.

The defendant maintained this area as a public
beach from Memorial Day to Labor Day and also

[9] In *B. W. & Leo Harris Co.* v. *Hastings,* 240 Minn. 44, 59 N.W.2d
813 (1953), the acts of the general public concerning the use of a
vacant lot for such things as ball games, carnivals, church affairs,
tent meetings, and parking cars without permission without evidence
connecting such use to the defendant city defeated the city's claim
of title by adverse possession. The public's use of the disputed area
in the case before us is clearly connected with the defendant town
as established by the evidence.

[10] We have had occasion to indicate that a city may acquire the
right to maintain a sewer upon and across private property by an
adverse user for a period of fifteen years; see *Alderman* v. *New
Haven,* 81 Conn. 137, 141, 70 A. 626 (1908); and that the right of
a grantor to regain title to land held by a municipal corporation by
reverter for breach of condition broken may be lost under what is
now General Statutes § 52-575 (§ 8314 of 1949 Revision of General
Statutes) where the right of entry is not exercised within fifteen
years after the breach. See *Nearing* v. *Bridgeport,* 137 Conn. 205,
75 A.2d 505 (1950); see also *Dawson* v. *Orange,* 78 Conn. 96, 124,
61 A. 101 (1905).

on weekends in September.[11] The referee also stated that "[u]ntil Labor Day it maintained, on a daily basis, a rest room at the westerly end of the beach area, at the southerly end of the public street, and kept two lifeguards in attendance from Memorial Day to Labor Day and week-ends until the end of September. The lifeguards supervised bathers, gave swimming lessons and performed all the usual activities of personnel so employed, and the Town cleaned the beach area once or twice a week, first by hand and later mechanically as well as by hand. The evidence shows that the Board of Recreation, at its meeting of February 9, 1959, took action to add another lifeguard at South Pine Creek Beach, and that the Park Commission and the Recreation Commission at their meetings had taken action to maintain the area as a public beach." It is clear that this was not merely use by the unorganized public but a well organized activity conducted by and through the defendant and was sufficient to allow for the assertion of a claim of title by adverse possession. See *Talbot* v. *Little Compton,* 52 R.I. 280, 160 A. 466 (1932).

---

[11] We note that the requirement of continuous possession for a period of fifteen years has been met in this case by the defendant's seasonal use of the beach area in dispute from 1959 until the plaintiffs first protested such use in 1976. With respect to the manner of continuous possession, " '[t]he location and condition of the land must be taken into consideration and the alleged acts of ownership must be understood as directed to those circumstances and conditions.' *Benne* v. *Miller,* 149 Mo. 228, 241, 50 S.W. 824 [1899]." *Lucas* v. *Crofoot,* 95 Conn. 619, 626, 112 A. 165 (1921). Regular and adverse use of property during the summer season is a sufficient basis for a claim of adverse possession. See *Kay* v. *Biggs,* 13 Ariz. App. 172, 175–76, 475 P.2d 1 (1970); *Nechtow* v. *Brown,* 369 Mich. 460, 462, 120 N.W.2d 251 (1963); *Booten* v. *Peterson,* 47 Wash. 2d 565, 568–69, 288 P.2d 1084 (1955); *Howard* v. *Kunto,* 3 Wash. App. 393, 397–98, 477 P.2d 210 (1970); *Burkhardt* v. *Smith,* 17 Wis. 2d 132, 139, 115 N.W.2d 540 (1962); annot., 24 A.L.R.2d 632 § 4; 3 Am. Jur. 2d, Adverse Possession § 57.

The plaintiffs also claim that the defendant's use of the beach property was not "exclusive" because the plaintiffs themselves used the beach during the time it was allegedly adversely possessed. We do not agree. "In general, exclusive possession can be established 'by acts, which at the time, considering the state of the land, comport with ownership; viz., such acts as would ordinarily be exercised by an owner in appropriating land to his own use and the exclusion of others.' *Family Land & Investment Co., Inc.* v. *Williams,* 273 Ala. 273, 278, 138 So. 2d 696, 699 (1961). Thus, 'the claimant's possession need not be absolutely exclusive; it need only be a type of possession which would characterize an owner's use.' *Norgard* v. *Busher,* 220 Or. 297, 308, 349 P.2d 490, 496 (1960)." *Lyons* v. *Andrews,* 226 Pa. Super. 351, 357–58, 313 A.2d 313 (1973); see *Nelson* v. *Vandemarr,* 281 Or. 65, 74, 573 P.2d 1232 (1978).

The defendant, in this case, was possessing the disputed beach area in a manner that an owner of a public beach would ordinarily follow. That the plaintiffs themselves used this beach area would not negate the exclusive use of the defendant since it did not alter the plaintiffs' knowledge or notice of the adverse claim, nor did it amount to an acknowledgement of the plaintiffs' title to the land.[12] See *Hinds* v. *Slack,* 293 Ala. 25, 29–30, 299 So. 2d 717 (1974); *Walker* v. *Walker,* 509 S.W.2d 102, 106 (Mo. 1974); *Porter* v. *Posey,* 592 S.W.2d 844, 851 (Mo. App. 1979); *Almond* v. *Anderegg,* 276 Or. 1041, 1045–46, 557 P.2d 220 (1976); *Lyons* v. *Andrews,* supra, 357–58. " 'It is sufficient if the acts of ownership are of such a character as to openly

---

[12] Nothing we say today interferes with the plaintiffs' continued use of the disputed beach area as members of the general public.

and publicly indicate an assumed control or use such as is consistent with the character of the premises in question.'" (Citations omitted.) *Pulcifer* v. *Bishop,* 246 Mich. 579, 584, 225 N.W. 3 (1929). Since the defendant was operating the disputed area as a public beach, it certainly would have been inappropriate to exclude the plaintiffs from using it. In fact, there was no evidence presented from which the court could reasonably conclude that the plaintiffs used the beach area in any other capacity than as members of the general public. The first claim of ownership which either of the plaintiffs asserted was in 1976 when Roche blocked passage to the beach area from east to west and wrote letters of protest to the first selectman and the department of public works. Those acts came too late since the defendant had commenced its possession in 1959 and obtained title by adverse possession in 1974.

The plaintiffs additionally attack the defendant's title by adverse possession by pointing out that the defendant, in 1967, impliedly recognized the plaintiffs' superior title to the disputed area when it secured easements across the properties in order to construct the dike. The referee held that the defendant "simply was insuring that they [sic] would not be trespassers, or that in the event of going on the plaintiffs' land, even temporarily, they would not be considered as encroaching." The referee stated that this was in recognition of the fact that the dike was constructed along the center line of Pine Creek, as it formerly existed, and could have, therefore, been built partially on the plaintiffs' land, inasmuch as they would own to the center of Pine Creek.

We must agree with the trial referee. Upon reviewing the easement,[13] we conclude that it merely recognized the fact that the plaintiffs owned the land north of where Pine Creek formerly existed and that, in constructing the dike, it might have been necessary to enter upon their properties. This did not impliedly recognize the plaintiffs' title to the disputed beach area which was located to the south of the proposed dike and which extended to the Sound. There was not recognition of a superior title in the plaintiffs to the disputed area.

Finally, the plaintiffs have claimed that the defendant's assertion of title by adverse possession

---

[13] The easement describes the Pardy (the Roches' predecessor in title) property as follows:

### "EASEMENT

KNOW ALL MEN BY THESE PRESENTS:

"WHEREAS DOROTHY L. PARDY, of the Town of Fairfield, in the County of Fairfield and State of Connecticut, is are the owner(s) of a tract of land situated in the Town of Fairfield, in the County of Fairfield and State of Connecticut, which property is *bounded in part by Pine Creek* and is more particularly described as follows:

"Lot No. 49 on Assessor's Map No. 238 of the Town of Fairfield." (Emphasis added.)

The granting clause provided:

"NOW, THEREFORE, in consideration of One ($1.00) Dollar and other valuable considerations received to my our full satisfaction, said owner (s) do (es) hereby grant to the Town of Fairfield an easement for the following purposes and upon the following terms and conditions:

"1. The owner (s) hereby grant (s) an easement to the Town of Fairfield, their agents, employees, contractors and assigns, the right and privilege *to construct on land or away from the shoreline of the land herein described or any part thereof,* shore protective works in accordance with recommendations contained in Public Works Department report to excavate or deposit material and erect structures necessary to accomplish such shore protective works (all as shown on map number 3726 on file in the Town Clerk's Office and identified as map showing easement lines for flood protective works along Pine Creek Avenue and Pine Creek, scale 1"–40', March 1, 1966)." (Emphasis added.)

violates article first, § 11 of the state constitution which provides: "The property of no person shall be taken for public use, without just compensation therefor." This claim was raised for the first time on appeal.[14] "The general rule against considering claims not raised at trial, Practice Book § 3063, applies also to constitutional issues. *New Haven Savings Bank* v. *Valley Investors,* 174 Conn. 77, 84, 384 A.2d 321 (1977); *Mechanics Savings Bank* v. *Tucker,* 178 Conn. 640, 425 A.2d 124 (1979); '[o]nly in most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court.' *State* v. *Evans,* 165 Conn. 61, 69, 327 A.2d 576 (1973)." *Burritt Mutual Savings Bank of New Britain* v. *Tucker,* 183 Conn. 369, 377, 439 A.2d 396 (1981). The plaintiffs have not demonstrated this to be such an "exceptional circumstance" and, therefore, we do not reach this issue.

[14] It is true that the plaintiffs' complaint alleges that the defendant "has deprived the plaintiffs of the peaceful enjoyment of their property without due process of law or just compensation." The trial court file indicates that the plaintiffs filed a memorandum of law both *before* and *after* the trial of this case and our examination of these memoranda demonstrates that this issue was not raised or discussed by the plaintiffs in either memorandum. The defendant's brief in this court maintains that this question "was not presented to the trial court *either in argument or in plaintiffs' briefs.*" (Emphasis added.) We also note that he has not set out this issue in his preliminary statement of issues. It is therefore quite obvious why the trial court did not address this in its memorandum of decision. "If a party intends to raise any claim of law which may be the subject of an appeal, he must either state the same distinctly to the court before his argument is closed or state it in a written trial brief. If this is not done, it will not be the duty of either the trial court or the appellate court to decide the claim." Practice Book § 285A; see *Petrillo* v. *Maiuri,* 138 Conn. 557, 86 A.2d 869 (1952); Practice Book §§ 3060B, 3063. This court will not consider any claim which was neither ruled upon nor decided by the trial court adversely to the moving party. See *Petrillo* v. *Maiuri,* supra, 562.

We therefore affirm the trial court's holding that the defendant acquired title to the disputed beach area by adverse possesion.

There is no error.[15]

In this opinion the other judges concurred.

## Appendix I

---

[15] Our holding that the defendant has obtained title by adverse possession makes it unnecessary for us to reach the defendant's alternative special defenses of right of way by prescriptive easement and implied dedication.