[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action seeking injunctive relief restraining the defendant church from interfering with a claimed prescriptive easement. The plaintiff Joan T. Kenney alleges that she is the owner of land which has historically been accessed through what is now part of the parking lot of the defendant North Canton Community United Methodist Church, Inc. ("church") and, because of the historical circumstances, she and her predecessor in interest, her mother, obtained prescriptive rights to the access. In 2001 the church attempted to block access to Kenney's property; this event immediately precipitated this action.
I find the facts as follows. Cherry Brook Road, also known as Route 179, runs generally in a north-south direction through the village of North Canton. Kenney lives on the westerly side of Cherry Brook Road. Roughly across the street from her is the defendant church. The church is immediately to the north of a small building formerly used as a schoolhouse by the Town of Canton. As will be noted more particularly, the town ceded the schoolhouse and its premises to the church in 1942. The church uses the land between the schoolhouse and the church building as a driveway and parking area. From the rear or easterly edge of the parking area there is a long unimproved roadway or driveway which leads to a pond and a cottage, which area is owned by Kenney. For many years access to the cottage and pond from Cherry Brook Road has been accomplished by passing over land in the schoolhouse lot, between the schoolhouse and the church, through what is now church parking lot, and into the driveway on Kenney's land. The primary issue for resolution is whether the historical circumstances are such that Kenney has obtained a prescriptive easement over the parking lot to access her cottage and rear lot. To resolve the issue, we will examine the sometimes murky but always fascinating historical records and human memories. The result of the inquiry is a surprisingly consistent constellation of events.
The plaintiff Kenney's family, the Tiltons,[1] moved to the area in 1931. Soon afterward, the cottage was built on the pond, which was CT Page 15334-dd created by a dam. For many years beginning in the 1940's Kenney's godmother, one Miele, lived in the cottage. Access was gained at first by a path on the schoolhouse property between the schoolhouse and the church; later, the pathway through the schoolhouse premises was paved along with some of the surrounding area. To reach the cottage, one would travel from Cherry Brook Road easterly across the paved area. At the easterly end of the pavement, an unimproved but very obvious and well-defined driveway extended several hundred feet onward to the cottage and the pond.
In 1942, the town of Canton transferred the schoolhouse property to the adjacent church by means of a quit claim deed. The deed does not contain any mention of the Tilton accessway. Use of the accessway continued as usual, however: all of the evidence indicates that by about this time the cottage was used as a year-round residence by Miele and that she, guests and business invitees routinely used the route through the former schoolhouse property now belonging to the church. Apparently Miele owned the cottage, while Tilton owned the land.
In 1957 Kenney bought the house across the street from the schoolhouse and the church and she still lives there. As will be noted, there were significant communications with the church at about this time.
Miele died in 1974 and the cottage was rented to others virtually uninterruptedly to the present time. A Gary Tilton was the tenant in 1975; from 1976 to 1985 David Knauf was the tenant. Knauf used the accessway as one would use any driveway to a residence.
In 1984, Mrs. Tilton died and her daughter, the plaintiff Joan Kenney, inherited the cottage and the land on the pond.[2] She continued to rent the premises while she lived across the street. Suzanne Wilcox rented the cottage from 1986 to 1994. She testified, and I credit her testimoney, that access was always gained by going through the church parking lot and up the drive from the back of the lot. She said there was never any interference with that passage, although arrangements were made during the church's strawberry festival to accommodate the extra crowds. If conditions were muddy, she would at times park her car in the church parking lot and walk the rest of the way in.
One Scott King lived in the cottage for less than a year, from 1994 to 1995, and Gail Easton leased the premises from 1995 to 2000. Alan Grandy, a young arborist, and his roommate next leased the premises in July, 2001, and moved in. Grandy testified that he used the parking lot and the driveway like the rest of the tenants, until, apparently not long after he moved in, the drive was blocked with a sawhorse. At first they CT Page 15334-de would simply move the sawhorse, drive up the driveway a short way and replace the sawhorse. Finally, a large dirt pile blocked access, and the tenants used a secondary "lower road" for access. This "lower road" is a rough hewn unimproved pathway through the woods. runs roughly parallel to and south of the driveway which historically provided access, and runs from Cherry Brook Road easterly over property entirely owned by Kenney to the lawn area adjacent to the pond and somewhat south of the cottage. Grandy and his roommate were able to use the lower access because they drove nonstandard vehicles and bushwacked their own steep pathway between the two drives. The lower pathway had been used very sporadically over the years, typically as a walkway to the pond rather than to the cottage. Although it does provide access to the property, it is considerably less convenient that the access through the church parking lot.[3]
It was the church that had blocked the traditional access; the church also, on December 5, 2001, filed in the Canton Land Records a notice of its intention to dispute Kenney's claimed right of way over its property, pursuant to § 47-39 of the General Statutes. These were the first unequivocal actions contesting the ability of Kenney and her tenants to use the claimed right of way.
On this scenario the plaintiff Kenney claims a prescriptive easement over the property of the church, because the use has been open and notorious for greater than the prescriptive period of fifteen years. See § 47-37 of the General Statutes. But the plot, almost needless to say, thickens. The church claims that the use was by permission, and therefore not assertion of a right. The church claims as well that the church asserted its hegemony over the easement from time to time and asserts additionally that Kenney's use was interrupted by church activities such as the annual strawberry festivals and occasional repaving and construction projects.[4]
It is clear from the evidence that Mrs. Tilton and Mrs. Kenney consistently asserted an interest in the passageway as a matter of right. No permission was ever sought from the church nor, so far as the evidence shows, from the town before it. As our examination of the controlling law will show, the assertion of a right, by itself, does not necessarily result in a prescriptive easement if the servient estate has granted permission rather than acquiesced in the assertion of the right. A significant question, then, is the extent to which the church granted permission. For the resolution of this question and others we examine, as well as we can, the historical record.
It may make sense to begin in 1942, when the town quit-claimed the CT Page 15334-df schoolhouse property to the church,[5] because, as a general rule, prescriptive easements may not be established against governmental entities. See, e.g., American Trading Real Estate Properties, Inc. v.Trumbull, 215 Conn. 68, 77-79 (1990); Restatement Third, Property (Servitudes) § 2.17, Comment e. The deed, as mentioned above, did not refer to any easement; on the other hand, it was a quit-claim deed. In any event, the evidence is clear that the Mieles and their invitees routinely and consistently used the church parking lot for access to the drive to the cottage and there was no evidence regarding the requesting or granting of permission or of any significant suspension of the usage.
In approximately 1958, the issue surfaced. A report of the trustees of the church, written most likely in 1958, discusses a controversy which arose between Mrs. Tilton and the trustees when the church was contemplating some construction. The report states that Tilton and her lawyer, John Kenney, who presumably was also her son-in-law, met with Hale Anderson, a lawyer for the church, "in a continuing effort to resolve problems which have arisen in connection with the Old Driveway passing over the Old Schoolhouse Property from the highway to Mrs. Tilton's land. Difficulty has arisen because Mrs. Tilton claims a legal right to the uninterrupted use of the driveway and cannot permit that use to be interrupted (unless the church grants a deed containing a written easement)." The church was advised by Anderson that "it is not certain that Mrs. Tilton has such clear legal rights" and the church hierarchy would not permit an easement to be granted explicitly. Anderson apparently consulted with H. Robert Hartigan, a lawyer at Day, Berry Howard, who advised Anderson that the church should arrange for Mrs. Tilton to be served with a notice indicating that the church intended to dispute her claim to a right of way and to then file the document on the land records.[6] He also proposed that the church then expressly grant Mrs. Tilton permission to cross church property so long as such use did not interfere with church use of the land.
Perhaps significantly, none of these steps was effected, and the uneasy truce continued. The social dynamic was complicated by the relationship between the church on the one hand and Mrs. Tilton and Mrs. Kenney on the other. The relationship with Mrs. Tilton was not entirely clear, because of course it was longer ago and Mrs. Tilton lived in Hartford, but she seems to have allowed church use of the pond area for youth activities and recreation. Mrs. Kenney has had a fairly close relationship with the church. Though not a formal member, she has been considered part of the broader church community[7] and has participated in numerous activities at the church. She has had a friendly relationship with the various ministers. Over the years, neither side has wanted to offend the other. CT Page 15334-dg
The general disinclination to offend blossomed, from time to time, into mutual accommodation. In approximately 1969, the Kenneys embarked on a project on their home across the street from the church and requested permission to park in the church parking lot while their driveway was not useable. The church granted permission, with, of course, some limitations regarding moving cars to accommodate plowing, and the like. In 1974, Mrs. Tilton found her accessway blocked by cars during Sunday morning worship services and said that she needed a sign placed so that the drive would be kept clear. The church cooperated in the effort, though it noted in its response that compliance with the request shall not encumber the church's title, which it "reaffirms to be free of any easements or similar encumbrances." When it agreed to extend permission, the church reserved the right to "terminate the arrangement", because it could not "permit the title to its property to be encumbered."[8] In specific context, the church was referring to a limited request; the more general language may perhaps have been used to try to reinforce the church's historical position of not expressly agreeing to the Tilton-Kenney claim of right.
The church also requested and received cooperation with several of its activities. For years the church has sponsored a strawberry festival and the attending crowd challenges the available parking area. The tenants over the years and, of course, the owners, have at least acquiesced in compromising their access on this day. In some years sawhorses have blocked the drive to the cottage in order to direct parkers to an adjacent field; sometimes tenants have simply not used the drive that day. In temporarily compromising access during the strawberry festival, it is far more likely than not that the intent of the church was to facilitate the festival rather than to affect the Tilton-Kenney claim to a legal right of passage.
The church has also engaged in repaving and expansion projects. A considerable amount of evidence, testimonial and documentary, was introduced regarding the accommodations required by the construction. Without cataloguing the evidence, suffice it to say that from time to time the parking lot would be unuseable for periods of time from a day to several days at a time. During these times, the tenants would have to make other arrangements.
I will comment more specifically about the evidence in the course of the legal discussion soon to follow. The pattern, however, is clear. Mrs. Tilton and Mrs. Kenney consistently asserted a legal right to the passageway, and their use, which incorporates the tenants' use, openly and notoriously asserted the right. They never asked for permission and, so far as the evidence shows, never specifically received permission to use CT Page 15334-dh the right of way. The church's response was more ambivalent. Most of the time the church probably had no articulated position: if there was no particular problem presenting itself, there was no need to upset an apple cart. Until 2001, the church did nothing specifically intended to challenge the right to the easement: although the issue almost came to a head in 1958, it was not resolved at that time. From time to time the church asserted that it had not allowed the encumbrance of its property, but it is clear from an evaluation of the entire history that the church never did explicitly and concretely meet the issue of the Tilton-Kenney claim of right.
On these facts, the plaintiff claims a prescriptive easement over the land now owned by the church and used as a driveway/parking area. The black letter law regarding prescriptive easements is easy to state, but sometimes hard to apply.
 "To acquire a right of way by prescription, there must be a user which is open, visible, continuous and uninterrupted for fifteen years and made under a claim of right." Andrzejczyk v. Advo System, Inc., 146 Conn. 428, 431, 151 A.2d 881 (1959). There can be no claim of right unless the use is without recognition of the rights of the owner of the servient tenement. Putnam, Coffin Burr, Inc. v. Halpern, 154 Conn. 507, 515, 227 A.2d 83 (1967). "A use by express or implied permission or license cannot ripen into an easement by prescription." (Citations omitted.) Sachs v. Toquet, 121 Conn. 60, 66, 183 A. 22
(1936). "Where the use depends on authority from the owner, it involves a recognition of his right to terminate, which negates the adverse character of the use." (Citation omitted.) Putnam, Coffin Burr, Inc. v. Halpern, supra, 515-16.
 Klar Crest Realty, Inc. v. Rajon Realty Corporation, 190 Conn. 163, 168 (1983).
"The essential elements of a right of way by prescription are a use which is (1) open and visible, (2) continuous and uninterrupted for fifteen years, and (3) engaged in under a claim of right." Zavisza v.Hastings, 143 Conn. 40, 45 (1955). "Use made under a claim of right means use that is made "without recognition of the rights of the owner of the servient tenement.' Zavisza v. Hastings, 143 Conn. 40, 46, 118 A.2d 902
(1955). `To establish an easement by prescription it is absolutely essential that the use be adverse. It must be such as to give a right of CT Page 15334-di action in favor of the party against whom it has been exercised.' Whitingv. Gaylord, 66 Conn. 337, 344, 34 A. 85 (1895). The use must occur without license or permission and must be `unaccompanied by any recognition of [the right of the owner of the servient tenement] to stop such use.' (Internal quotation marks omitted.) Westchester v. Greenwich, supra, 227 Conn. 501." Crandall v. Gould, 244 Conn. 583, 590-91 (1998).
There can be no question on the facts of this case that the use by the Tilton-Kenney interest was open, visible and notorious for greater than fifteen years. The church argues, however, that the elements regarding uninterrupted use and use under a claim of right have not been established.
I first consider the issue of whether the plaintiff has established by a preponderance of the evidence that the use was adverse to that of the church. First, the use by the party claiming the easement does not have to be exclusive; rather, the use has to be one that is without recognition of any right of the servient estate to terminate the claimant's use. See, e.g., Zavisza, supra, 46; Klar Crest Realty, supra, 168. Thus the plaintiffs use of the parking lot, even with concurrent use by the church and even the general public, is sufficient to establish the element of adversity so long as any right in the servient estate to terminate the use is not recognized and so long as the claimant's use is sufficiently distinguished from that of the general public to serve notice upon the servient estate. Klar Crest, supra, 168; Roche v.Fairfield, 186 Conn. 490, 502 (1982). If the use is by permission of the servient estate, then, of course, the claimant's use is not adverse and not effectively made under claim of right. Putnam, Coffin Burr,Inc. v. Halpern, 154 Conn. 507, 515-16 (1967); Reynolds v. Soffer,190 Conn. 184 (1983); Phillips v. Bonadies, 105 Conn. 722, 725-26
(1927). There is no presumption that a use of long duration is either permissive or adverse: rather, the party claiming the easement has the burden of proving by a preponderance that the use was adverse, that is, made under a claim of right. Reynolds v. Soffer, supra, 188.
Again, the plaintiffs use[9] was continuously open and notorious since at least the 1930's and certainly since 1942, the starting point for our purposes. The plaintiffs predecessor and tenants used the premises in such a way that any right that the church had to stop or to limit the use was both implicitly and explicitly contested. When the way to the driveway was blocked by sawhorses, tenants moved the sawhorses. Whenever the issue was aired, Mrs. Tilton, Mrs. Kenney or an attorney on their behalf consistently and unambiguously asserted their right to use the access through the parking lot. In the 1958 time frame, the church might have asserted its hegemony over the easement, but it apparently CT Page 15334-dj backed off. I interpret this behavior to be more consistent with an acquiescence in the right of the plaintiff to use the right of way than in the grant of any permission. "A permissive user therefore as distinguished from one exercised under a claim of right is not to be inferred from mere passive acquiescence." Phillips v. Bonadies, supra, 726; see also Lisiewski v. Seidel, 72 Conn. App. 861, 873 (2002).
Although the church was not willing expressly to recognize the right of the plaintiff to the easement, it never effectively challenged the claimed right. A document could at any time have been filed pursuant to § 47-39 of the General Statutes; indeed, such a document was filed in 2001 and was urged without result by counsel to be filed in 1958.[10]
The right of way could have been more effectively blocked. The factual scenario is very much like that presented in Phillips v. Bonadies, supra. There, the servient estate attempted half measures to contest the consistently claimed right of the dominant estate. See also Restatement, supra, § 2.17 Comment j. As in Phillips, the expressions of lack of agreement with the claimed right are, if not carried into execution, consistent with an acquiescence in the claimed right.
The church also asserts the position that it granted permission to use the right of way, and that the use is not therefore adverse. See, e.g.,Top of the Town, LLC v. Somers Sportsmen's Association, Inc.,69 Conn. App. 839 (2002). The difficulty is that although there was substantial evidence to the effect that the parties were generally friendly through the years, and that differences arose only occasionally when a specific issue arose about the claimed easement, there also has never been a formal grant of permission. See Missionary Society v.Coutu, supra, 580. The permission given to Mrs. Kenney to park cars in the lot while her driveway was under construction, for example, is an entirely different use from that of a right of way to adjacent property.
Even if permission were extended at some point, it would have been only after a period of time of open and notorious adverse use. Just as one originally occupying under a grant of permission has the burden to give notice to the servient estate that its use is adverse if it intends to perfect the adverse interest; see Krohner v. Seyburt Associates LimitedPartnership, 20 Conn. App. 298, 301 (1989); a party occupying under a claim of right cannot logically be said to be ousted of that right if the servient estate later grants permission, unless the claimant agrees to submit to the grant of permission. See Top of the Town, supra. Although the plaintiff did agree, either expressly or by implication, not to use the right of way when it was being repaved or repaired, such conduct did not recognize the right of the servient estate to terminate the easement; rather, it recognized a temporary disruption for the purpose of CT Page 15334-dk repair. Repair is certainly consistent with an asserted easement.
The church also seems to object on the ground that the use was interrupted by the various repairs, the strawberry festivals, and the like. There is little doubt that use was at times compromised. But temporary disruption does not terminate an easement or require the fifteen year period to begin again. See Restatement, supra, Comment j; see also Roche v. Fairfield, supra, 500-01 (Claimant can establish adverse use by using property only in the summer). One factual issue is whether the interruption is intended to serve notice that the conduct of the servient estate is intended to contest the dominant estate's easement; in this case, the evidence was clear that the interruption was a mutual accommodation.
The use of the easement by the Tilton-Kenney interest was clearly differentiated from the use of the parking lot by the general public. Only the owners and tenants of the dominant estate continued on to the cottage, and the scanty records to which we have access show that the dominant estate expressly and unequivocally notified the servient estate of its claim of right. As such, the use was obviously different in kind from that of the general public and the actions were more than sufficient to notify the servient estate of its claim to an individualized right. See Klar Crest Realty, supra, 168; Missionary Society, supra, 583;Phillips v. Bonadies, supra, 728.
The first five defenses, then, are denied on the basis of the foregoing discussion. I find no support in the evidence to the last three defenses. As to laches, the plaintiff acted quickly when the easement actually was effectively challenged. There has been no misleading or unfair conduct on the part of the plaintiff such that the claim would be barred by the application of equitable estoppel or the doctrine of unclean hands.
Finally, it should be noted that the imposition of a prescriptive easement in the circumstances of this case is consistent with the theoretical, and at times fictional, bases underlying the theory of prescriptive easements. The theory is grounded in two somewhat inconsistent notions: the "lost deed" fiction, in that a long and otherwise unexplained use must be based on a grant which has been misplaced,[11] and the idea that property ought to be useful: if property is used in a particular fashion for a number of years, without effective rebuff, then that use must be beneficial. Over the passage of time, the servient estate, by resting on its rights, in a sense is barred by notions of statutes of limitations. See Restatement, supra. In this case, the plaintiff and her predecessors and tenants consistently CT Page 15334-dl exercised the easement under a claim of right. The church was understandably ambivalent about its response. In this context, the Tilton-Kenney right was established in 1957, and certainly the dominant estate never recognized any need for permission by the church. The church did accomplish the required acts in 2001, but this was 59 years after the prescriptive period began to run. Judgment may enter for the plaintiff.[12] The church is enjoined from obstructing, closing or interfering with the right of way. Temporary accommodations such as have occurred in the past are permitted.
 ___________________, J. Beach