******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JAMES M. PETERSON *v.* MONICA
MCANDREW ET AL.
(AC 36327)

Beach, Prescott and Bear, Js.

*Argued March 4—officially released September 29, 2015*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Genuario, J.)

*Kimberly A. Knox*, with whom was *Dana M. Hrelic*,
for the appellant-appellee (plaintiff).

*Mark S. Gregory*, for the appellees-appellants
(defendants).

*Opinion*

BEACH, J. The plaintiff, James M. Peterson, appeals from the judgment of the trial court rendered, in part, in favor of the defendants, Monica McAndrew and David M. Chute, and the defendants cross appeal. The dispute arises from an agreement whereby the plaintiff was to purchase a parcel of land from the defendants.[1] Although the defendants owned the entire parcel, it was not possible to convey marketable title to the entire parcel. The plaintiff claims that the court erred in concluding that (1) the defendants did not breach the contract; (2) the defendants were not unjustly enriched by the full amount of the plaintiff's deposit; (3) the parties were not mutually mistaken as to what was being conveyed when they signed the purchase and sales agreement; (4) Chute did not make misrepresentations of fact to induce the plaintiff to enter into the sales agreement; (5) Chute did not violate the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; and (6) the defendants were entitled to attorney's fees pursuant to the contract. On cross appeal, the defendants claim that the court erred in (1) concluding that enforcement of the liquidated damages provision of the contract, as written, resulted in unjust enrichment, and (2) awarding attorney's fees in a lesser amount than requested. We agree with the defendants' claim regarding the unjust enrichment count and disagree with the remaining claims of both parties. Accordingly, we reverse in part the judgment of the trial court.

The following facts, as found by the trial court and as revealed in a joint stipulation of facts that was expressly adopted by the trial court, are relevant to our resolution of these appeals. In 2009, the defendants owned a single-family residence at 43 Rowayton Avenue in Norwalk. They listed the property for sale, describing it as "direct waterfront property" with "expansive sandy beach." In February, 2011, the plaintiff became interested in purchasing the property and met with Chute. During this meeting, Chute told the plaintiff that the property had benefited from accretion[2] and that the property that he was offering for sale included the land to the current mean high waterline. Chute provided the plaintiff with a survey of the property, which showed a property line depicted on map #591 of the Norwalk land records (591 map). The 591 map was recorded in the Norwalk land records in 1924. It depicted a subdivision of a substantial tract of land. The 591 map labelled the property at issue in this case as "lot 3" and showed it bounded by Rowayton Avenue on the east and on the west by the approximate mean high waterline as it existed at that time (591 line). Since 1924, the physical condition of the property changed, and the portion of the property that was bounded by the mean high waterline on the west had expanded as a result of accretion. During the February, 2011 meeting, Chute told the plain-

tiff that he owned the property between the 591 line and the current mean high waterline. In their discussions prior to the execution of the contract, the parties did not consider the nature of the title to be conveyed.

In April, 2011, the plaintiff and the defendants entered into a purchase and sales agreement (contract) for the sale of the property. Both the plaintiff and Chute had reasonable levels of business sophistication. The purchase price for the property, as set forth in the contract and agreed upon by the parties, was $2,550,000. To comply with a condition of the contract, the plaintiff deposited $255,000 with the defendants' counsel. Paragraph 1 of the contract provides: "The seller in consideration of the purchase price hereinafter specified, hereby agrees to sell and convey, and the buyer hereby agrees to purchase the real property commonly known as 43 ROWAYTON AVENUE, ROWAYTON (NORWALK), Connecticut and specifically described in Schedule A attached hereto  . . . ."

The contract provides in schedule A that the property at issue was bounded on the west by the 591 line, or, in other words, by the 1924 mean high waterline. By the action of accretion over the years, the current mean high waterline was farther west than the 1924 mean high waterline. The 1924 mean high waterline coincided with a bulkhead consisting of piers and tarred material. At that time, the bulkhead established the western boundary of the property. In the early 1930s a masonry wall was constructed to the west of the original bulkhead. Since then, additional beach area to the west of the masonry wall line has been created by accretion.

Before and after the execution of the contract, the plaintiff and Chute talked about demolishing the existing house and constructing a new house. The plaintiff knew that Chute had built several single-family houses. He liked Chute's work and hoped that he and the defendants would reach an agreement for the construction of a single-family residence on the property. After the contract was signed, the plaintiff and Chute developed plans for the construction of a house and a swimming pool. When Chute provided a copy of the plans to Norwalk zoning officials, he was asked to provide the zoning office with proof of ownership of the area west of the 591 line. Subsequent research into ownership of the property revealed, as previously discussed, that the property had been built up over the years by a combination of accretion and fill.

At all relevant times, the defendants were ready, willing and able to convey marketable title[3] to the property specifically described in schedule A of the contract, and to quitclaim all of their title to and interest in the property located west of the 591 line. The plaintiff was ready, willing and able at all times to pay the total purchase price required in the contract upon receipt of a warranty deed conveying *marketable title* to all of

the land bounded on the east by Rowayton Avenue and on the west by the current mean high waterline. The plaintiff was not willing to pay the full purchase price unless the warranty deed conveyed marketable title to the property to the current mean high waterline, and the defendants were not able to do this. By e-mail dated June 30, 2011, the plaintiff demanded that the defendants close on the property; by an email of the same date, the defendants stated that they were prepared to close and to deliver good title to the premises described in the contract (schedule A). A closing never was scheduled.

By letter dated July 8, 2011, the plaintiff noted that the contract was terminated and demanded the return of the deposit. The defendants refused to return the deposit and sold the property to a third party in August, 2011, for $2,525,000, which was $25,000 less than the purchase price agreed upon by the plaintiff and the defendants. The plaintiff has demanded and the defendants continuously have refused to return to the plaintiff the $255,000 deposit. The court determined that it was unnecessary to reach any conclusion as to who actually owned the property west of the 591 line, but nonetheless said that the more persuasive evidence indicated that the defendants owned the property to the current mean high waterline. Had the plaintiff completed the transaction as suggested by the defendants, he would have owned the property to the current mean high waterline.

In his fourth amended complaint, the plaintiff alleged breach of contract and unjust enrichment against both defendants, and negligent misrepresentation, fraudulent misrepresentation, and a violation of CUTPA, innocent misrepresentation and mutual mistake against Chute. The defendants filed a counterclaim alleging that the plaintiff was unjustly enriched by the work performed by Chute in preparing for the construction of the improvements.

After a trial, the court initially found in favor of the defendants on the plaintiff's entire complaint and found in favor of the plaintiff on the defendants' counterclaim. The plaintiff filed a motion for reargument/reconsideration of the breach of contract and unjust enrichment counts of his complaint. The court revised its initial decision on the unjust enrichment claim and rendered judgment in favor of the plaintiff in the amount of $124,266. It reaffirmed its judgment as to all other counts of the complaint. The defendants filed a motion for attorney's fees. The court granted the motion and awarded attorney's fees of $80,000 and "disbursements incurred by the defendants" in the amount of $741.35. These appeals followed.

I

The plaintiff first claims that the court erred in render-

ing judgment against him as to the count alleging that the defendants breached the contract. We disagree.

The court observed that the contract obligated the seller, upon receiving the total purchase price, to convey to the plaintiff the premises described in schedule A. The court determined that the contract's description of the property to be conveyed with marketable title was unambiguous. The court reasoned that schedule A, referenced in the contract, defined the property as that described as lot 3 on map 591. The plaintiff claimed that the defendants had been obligated to convey marketable title to the accreted strip extending to the current mean high waterline in addition to the property described in schedule A. The court stated that because the contract was unambiguous, it ought not look beyond the four corners of the contract, and that taking the plaintiff's position would require it to ignore or to violate the parol evidence rule.

The plaintiff argues that the court erred in determining that the defendants were obligated to convey marketable title only to property described in schedule A when the provisions of the contract demonstrated the parties' intent to do otherwise. He contends that the contract, in paragraph 1, defined the "property" in two ways: (1) as 43 Rowayton Avenue and (2) as the property defined in schedule A. He argues that schedule A, by its terms, excluded a portion of the property bounded by the mean high watermark. He further notes that paragraph 38 of the contract provided that the seller was to transfer to the buyer pending applications to the state Department of Environmental Protection and the United States Army Corps of Engineers "to install a dock, pier and ramp at the Premises." He argues that this provision showed that the contract contemplated the transfer of waterfront property, and that the property described in schedule A alone was not literally on the waterfront. In light of this ambiguity, the plaintiff argues, the court erred in failing to consider parol evidence as to the intent of the parties in conveying waterfront property.

"[T]he interpretation of [definitive contract] language [is] a question of law subject to plenary review by this court. . . . If a contract is unambiguous within its four corners the determination of what the parties intended by their contractual commitments is a question of law." (Citation omitted; internal quotation marks omitted.) *Western Dermatology Consultants, P.C.* v. *VitalWorks, Inc.*, 146 Conn. App. 169, 187, 78 A.3d 167, cert. granted on other grounds, 310 Conn. 955, 81 A.3d 1182 (2013).

"In determining a boundary line in a deed, the law is clear that the description in the deed, if clear and unambiguous, must be given effect. In such a case, there is no room for construction. The inquiry is not the intent of the parties but the intent which is expressed in the deed." (Internal quotation marks omitted.) *Mierzejew-*

*ski* v. *Laneri*, 130 Conn. App. 306, 311, 23 A.3d 82, cert. denied, 302 Conn. 932, 28 A.3d 344 (2011).

The contract for the purchase of property is unambiguous. Paragraph 1 provides only one description of the property: it is defined as the property in schedule A and only schedule A. The contract states: "The seller in consideration of the purchase price hereinafter specified, hereby agrees to sell and convey, and the buyer hereby agrees to purchase the real property commonly known as 43 ROWAYTON AVENUE, ROWAYTON (NORWALK), Connecticut and specifically described in Schedule A attached hereto . . . ." The contract notes that the property is "commonly" referred to as 43 Rowayton Avenue and is "*specifically described*" in schedule A. (Emphasis added.) The street address generally located the property and provided useful information, but it did not establish or purport to establish boundaries to the property. Rather, the contract expressly stated that schedule A provided the specific description of the property. Schedule A clearly described the property as "that certain tract or parcel of land, situated in the Town of Norwalk, known and designated as lot number three (3) on a certain map . . . which map is recorded in the office of the town clerk of said Norwalk as map number 591." Map 591 described the property as being bounded on the west by the mean high watermark as of 1924. The description of the property conveyed by the deed is clear and unambiguous; see *Mierzejewski* v. *Laneri*, supra, 130 Conn. App. 311; see also *Lisiewski* v. *Seidel*, 72 Conn. App. 861, 866, 806 A.2d 1121 ("[i]n determining the location of a boundary line expressed in a deed, if the description is clear and unambiguous, it governs and the actual intent of the parties is irrelevant"), cert. denied, 262 Conn. 921, 922, 812 A.2d 865 (2002).

The plaintiff additionally argues that the reference in paragraph 38 of the contract to the transfer of pending applications for the installation of a dock, pier and ramp "at the [p]remises" created an ambiguity. Because the unambiguous language in the description of the property conveyed is controlling, reliance on other language obliquely hinting at a different intent is misplaced. Moreover, the provision in paragraph 38 merely indicated that the defendants were to transfer certain pending applications. The language, "at the [p]remises," clarified which applications were to be transferred; the casual language could not in itself vary the express description of the premises conveyed. See *Mierzejewski* v. *Laneri*, supra, 130 Conn. App. 314; see also *Lisiewski* v. *Seidel*, supra, 72 Conn. App. 869.

There was no ambiguity in the description of the property and the court properly declined to consider parol evidence[4] to vary the terms of the integrated contract.[5] "The parol evidence rule does not of itself . . . forbid the presentation of parol evidence, that is, evi-

dence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract." (Internal quotation marks omitted.) *Weiss* v. *Smulders*, 313 Conn. 227, 249, 96 A.3d 1175 (2014).

We conclude that the contract was unambiguous as to the description of the property. Although the plaintiff argues that the contract was ambiguous as to whether the contract provided that the property to be conveyed included accreted land, the contract clearly and specifically delineated the property to be conveyed by the deed. Thus, the court properly determined that the defendants did not breach the contract by being ready, willing and able to close and deliver marketable title only to the 591 line, because that was the description of the property in the contract, as referenced by schedule A and map 591.

## II

The plaintiff next claims that the court erred in determining that the defendants were not unjustly enriched by retaining some of the plaintiff's $255,000 deposit. On cross appeal, the defendants claim that the court erred in concluding that the defendants were not entitled to retain the full amount of the deposit. We agree with the defendants.

The plaintiff argued in the trial court that the defendants were unjustly enriched by their retention of the contract deposit of $255,000. In its original memorandum of decision, the trial court noted that the contract required the plaintiff to deposit $255,000 with the defendants' attorney on signing the contract and further provided that, in the event of a default by the plaintiff buyer, the sellers' remedy was to terminate the contract and to retain the down payment as liquidated damages. The court then found the buyer to be in default because he rejected the conveyance of marketable title to the described premises and refused to tender the purchase price. The court determined that the liquidated damages provision of the contract was enforceable and, thus, that the plaintiff's claim of unjust enrichment failed.

The plaintiff moved for reconsideration, and the court noted that in its original decision it had overlooked *Vines* v. *Orchard Hills, Inc.*, 181 Conn. 501, 435 A.2d 1022 (1980), cited in the plaintiff's motion for reconsideration. The trial court, relying on *Vines*, reversed itself and decided not to enforce the liquidated damages clause. It first determined that the plaintiff's breach was not wilful. The court expressly noted in the present case that the plaintiff's subjective fear that he would not own waterfront property after the closing[6] was not legally justified, but, nonetheless, was genuine. Second, the court found that the defendants incurred actual damages of $130,734. The trial court found that, after

the plaintiff's default, the defendants sold the property to third party purchasers, Thomas Keller and Laura Keller, for $2,525,000, which was $25,000 less than the contract price with the plaintiff. The closing for the sale to the Kellers was held on August 31, 2011. The defendants provided the Kellers with a warranty deed, for the property as described on schedule A and map 591, and a quitclaim deed for the property west of the 591 line. There were greater expenses incurred in the sale to the Kellers than those that would have been incurred if the plaintiff had closed on the property pursuant to the contract. The increase included a higher broker commission in the amount of $12,500 and a higher conveyance tax in the amount of $6313, due to a change in the law. The defendants paid carrying costs with respect to the property because of the delay in closing. The additional carrying costs included mortgage interest of $23,450; property taxes of $8836; insurance costs of $748; and Rowayton Beach Association dues of $72. The defendants also incurred additional legal fees in the amount of $5039, additional attorney's fees in the amount of $18,454, and dock permit application expenses of $1554. They lost a reasonable return on their equity in the property in the amount of $5268. The court reasoned that "[b]ecause the actual damages incurred by the defendants are so disparate, from the amount that they seek to retain pursuant to the liquidated damages clause the court finds that the plaintiff has sustained his burden of proof with regard to count two that the defendants have been unjustly enriched in the amount of $124,266."

The plaintiff claims that the court erred in calculating the amount of the defendants' actual damages to be $130,734 ($255,000 less $124,266) because (1) the court did not calculate the defendants' actual damages as of the date of the plaintiff's breach, but rather included calculations of damages occurring *after* the breach; and (2) the court improperly considered incidental and consequential damages in its assessment of whether the damages suffered were "substantially less" than those provided for under the liquidated damages clause, pursuant to *Vines* v. *Orchard Hills, Inc.*, supra, 181 Conn. 513.

On cross appeal, the defendants argue that the liquidated damages clause was enforceable because it met the three conditions set forth in our case law. See *American Car Rental, Inc.* v. *Commissioner of Consumer Protection*, 273 Conn. 296, 306–307, 869 A.2d 1198 (2005). They further argue that it is not appropriate to calculate actual losses in order to decide whether a liquidated damages clause applies.[7] We agree with the defendants.

The liquidated damages provision of the contract provides in paragraph 16: "If BUYER is in material default hereunder and the closing fails to occur within thirty

(30) days of the date set forth herein for closing, and Seller is not in default hereunder, or, on or before the date of closing as set forth herein, indicates in writing that BUYER is unable or unwilling to perform and SELLER stands ready to perform SELLER's obligations, SELLER's sole and exclusive remedy shall be the right to terminate this agreement by written notice to BUYER or BUYER's attorney and retain the down payment as reasonable liquidated damages for BUYER's inability or unwillingness to perform."

"A provision for liquidated damages . . . is one the real purpose of which is to fix fair compensation to the injured party for a breach of the contract. In determining whether any particular provision is for liquidated damages or for a penalty, the courts are not controlled by the fact that the phrase liquidated damages or the word penalty is used. Rather, that which is determinative of the question is the intention of the parties to the contract. Accordingly, such a provision is ordinarily to be construed as one for liquidated damages if three conditions are satisfied: (1) The damage which was to be expected as a result of a breach of the contract was uncertain in amount or difficult to prove; (2) there was an intent on the part of the parties to liquidate damages in advance; and (3) the amount stipulated was reasonable in the sense that it was not greatly disproportionate to the amount of the damage which, as the parties looked forward, seemed to be the presumable loss which would be sustained by the contractee in the event of a breach of the contract." (Internal quotation marks omitted.) *American Car Rental, Inc.* v. *Commissioner of Consumer Protection*, supra, 273 Conn. 306–307. The court found before reconsideration that these conditions were satisfied and that the clause, as written, was not unconscionable. The court on reconsideration, was not asked and therefore did not reconsider whether the claim was unenforceable, but simply decided that enforcing it in the circumstances would result in unjust enrichment. The plaintiff does not contest this finding on appeal.

The plaintiff claims on appeal that the defendants were unjustly enriched by retaining the deposit as liquidated damages when actual damages were "substantially less" than the liquidated amount. In *Vines* v. *Orchard Hills, Inc.*, supra, 181 Conn. 503, a husband and wife, the purchasers, had given the seller a $7880 down payment toward the purchase of a condominium, which amount was designated in the contract of sale to be liquidated damages on default. The buyers later refused to accept title to the property because the husband's employment was transferred out of state. Id. The purchasers established at the trial court that they had agreed to buy the condominium for $78,800 and that by the time of trial, approximately six years later, the condominium had a fair market value of $160,000. Id., 503. The trial court, using the fair market value at the

time of trial, concluded that, because the seller had received a windfall of approximately $80,000, the purchasers were entitled to recover their down payment. Id. There was no evidence at trial of the market value of the condominium at the time of the breach or the damages sustained by the seller as a result of that breach. Id., 503–504.

In *Vines*, our Supreme Court addressed the issue of "the enforceability of a liquidated damages clause as a defense to a claim of restitution by purchasers in default on a land sale contract." Id., 504. The court held that "a purchaser whose breach is not willful has a restitutionary claim to recover moneys paid that unjustly enrich his seller." Id. 509. The court further stated: "Despite the judicial resistance that [liquidated damages] clauses have encountered in the past . . . this court has recognized the principle that there are circumstances that justify private agreements to supplant judicially determined remedies for breach of contract. . . . This court has however refused to enforce an otherwise valid liquidated damages clause upon a finding that no damages whatsoever ensued from the particular breach of contract that actually occurred. *Norwalk Door Closer Co.* v. *Eagle Lock & Screw Co.*, 153 Conn. 681, 689, 220 A.2d 263 (1966). Most of the litigation concerning liquidated damages clauses arises in the context of an affirmative action by the party injured by breach to enforce the clause in order to recover the amount therein stipulated. In such cases, the burden of persuasion about the enforceability of the clause naturally rests with its proponent. . . . In the case before us, by contrast, where the plaintiffs are themselves in default, the plaintiffs bear the burden of showing that the clause is invalid and unenforceable. . . . It is not unreasonable in these circumstances to presume that a liquidated damages clause that is appropriately limited in amount bears a reasonable relationship to the damages that the seller has actually suffered. . . . A liquidated damages clause allowing the seller to retain 10 percent of the contract price as earnest money is presumptively a reasonable allocation of the risks associated with default. . . . The presumption of validity that attaches to a clause liquidating the seller's damages at 10 percent of the contract price in the event of the purchaser's unexcused nonperformance is, like most other presumptions, rebuttable. The purchaser, despite his default, is free to prove that the contract, or any part thereof, was the product of fraud or mistake or unconscionability. . . . In the alternative, the purchaser is free to offer evidence that his breach in fact caused the seller no damages or damages substantially less than the amount stipulated as liquidated damages. See *Norwalk Door Closer Co.* v. *Eagle Lock & Screw Co.*, supra, 689." (Citations omitted; internal quotation marks omitted.) *Vines* v. *Orchard Hills, Inc.*, supra, 181 Conn. 511–13.

The court in *Vines* concluded that the trial court

had erred in concluding that the sellers had received a windfall because the relevant time as of which to measure the seller's damages is the time of breach. Id., 513. The court noted that there was no evidence that the seller was not injured at the time of the purchaser's breach and concluded that "[b]ecause the availability of, and the limits on, restitutionary claims by a plaintiff in default have not previously been clearly spelled out in our cases, it is appropriate to afford to the purchasers herein another opportunity to proffer evidence to substantiate their claim. What showing the purchasers must make cannot be spelled out with specificity in view of the sparsity of the present record. The purchasers may be able to demonstrate that the condominium could, at the time of their breach, have been resold at a price sufficiently higher than their contract price to obviate any loss of profits and to compensate the seller for any incidental and consequential damages. Alternatively, the purchasers may be able to present evidence of unconscionability or of excuse, to avoid the applicability of the liquidated damages clause altogether. The plaintiffs' burden of proof is not an easy one to sustain, but they are entitled to their day in court." Id., 514.

In *Norwalk Door Closer Co.* v. *Eagle Lock & Screw Co.*, supra, 153 Conn. 689, our Supreme Court determined that an otherwise valid liquidated damages clause was not enforceable where the nonbreaching party suffered *no* damages. The court reasoned: "The circumstances which the parties might reasonably foresee at the time of making a contract could, in any given case, be vastly different from the circumstances which actually exist when a court is called upon to enforce the contract. It is not the function of the court to determine by hindsight the reasonableness of the expectation of the parties at the time the contract was made, but it is the function of the court at the time of enforcement to do justice. In the ordinary contract action the court determines the just damages from evidence offered. In a valid contract for liquidated damages, the parties are permitted, in order to avoid the uncertainties and time-consuming effort involved, to estimate in advance the reasonably probable foreseeable damages which would arise in the event of a default. Implicit in the transaction is the premise that the sum agreed upon will be within the fair range of those just damages which would be called for and provable had the parties resorted to proof. Consequently, if the damage envisioned by the parties never occurs, the whole premise for their agreed estimate vanishes, and, even if the contract was to be construed as one for liquidated damages rather than one for a penalty, neither justice nor the intent of the parties is served by enforcement. To enforce it would amount in reality to the infliction of a penalty." Id., 688–89.

In *Stabenau* v. *Cairelli*, 22 Conn. App. 578, 577 A.2d 1130 (1990), this court held that the trial court's finding

of unjust enrichment was not clearly erroneous because there was evidence to support the trial court's finding that the purchaser's breach was not wilful, but rather was prompted by a fear that he would lose his job and be unable to make the payments necessary for the purchase of the real estate, and that the sellers sold the real estate at a higher price, thereby suffering *no damage*. Citing *Vines*, this court stated: "Otherwise valid liquidated damages clauses may not be enforced when the nonbreaching party suffers no damages. [I]f the damage envisioned by the parties never occurs, the whole premise for their agreed estimate vanishes, and . . . neither justice nor the intent of the parties is served by enforcement. . . . A purchaser of real property does not, despite his knowing default, forfeit the right to seek restitution of sums of money earlier paid under the contract of sale, even when such payments are therein characterized as liquidated damages. . . . A buyer in nonwillful default can recover monies paid upon the contract and retained by the seller, despite an otherwise valid liquidated damages clause, where the seller has sustained no damages. . . . A conclusion of unjust enrichment required the court to find that the plaintiffs' breach was not willful and that the defendants sustained no damage or damage substantially less than the amount stipulated in the liquidated damages clause. . . . These conclusions are factual findings that we will not retry on appeal. . . . Our review is limited solely to the determination of whether, on the record, the court's determinations are clearly erroneous." (Citations omitted; internal quotation marks omitted.) Id., 580–81 (liquidated damages provision in contract not enforceable because nonbreaching seller suffered no damages).

We need not address the plaintiff's argument that the trial court erred in failing to award in restitution damages the full amount of the $255,000 deposit because we conclude that the liquidated damages clause should have been enforced. In balancing the sometimes competing considerations of liquidated damages clauses and equitable restitution, *Vines* carved out an exception to the enforcement of otherwise valid liquidated damages clauses in certain circumstances. The court noted that the breaching party bears the burden of rebutting the presumptive validity of liquidated damages clauses that fix damages at 10 percent of the real estate contract price. The buyer has the burden to prove that his nonwilful breach "in fact caused the seller no damages or damages substantially less than the amount stipulated as liquidated damages." *Vines* v. *Orchard Hills, Inc.*, 181 Conn. 513. The present case differs from *Stabenau* and *Norwalk Door Closer Co.*, in which the nonbreaching party suffered no damages. We then must consider the language in *Vines* stating that liquidated damages clauses may be unenforceable when the actual damages are "substantially

less" than the contractual amount of liquidated damages. *Vines* does not elaborate on the language. The parties have not referred us to any binding authority, nor have we been able to find any, that addresses the scope of the *Vines* exception.

Expansion of the "substantially less" exception in *Vines* would allow the tail to wag the dog. Parties contract for liquidated damages clauses at least partly because of difficulty in assessing damages.[8] So long as neither the contract nor its enforcement is patently inequitable, parties are to be accorded the benefits, or burdens, of their bargains; after-the-fact parsing of damages defeats that purpose. "Because [t]he very purpose for which [liquidated damages] provisions are sustained is to obviate the difficulties of [proof of actual damage], once such a provision is found to be valid, no proof of the true amount of injury is required. . . . Rather, if an anticipated measure of damages is specified in the contract, the terms of the contract prevail over any measure of actual damages. The liquidated amount is not reduced or expanded by the actual damage suffered." (Citations omitted; internal quotation marks omitted.) *Litton Industries Credit Corp.* v. *Catanuto*, 175 Conn. 69, 74–75, 394 A.2d 191 (1978). The exception in *Vines* may be invoked to avoid injustice in unusual situations.[9] See, e.g., *Stabenau* v. *Cairelli*, supra, 22 Conn. App. 580.

The court erred in concluding that the actual damages in this case were so substantially less than that provided as liquidated damages that the provision was unenforceable. Accordingly, we reverse the judgment of the trial court as to the unjust enrichment count and direct judgment in favor of the defendants.

### III

The plaintiff next claims that the court erred in determining that there was no mutual mistake sufficient to compel reformation of the contract. We disagree.

"A mutual mistake is one that is common to both parties and effects a result that neither intended. . . . In that sense, a mutual mistake requires a mutual misunderstanding between the parties as to a material fact." (Citation omitted; internal quotation marks omitted.) *BRJM, LLC* v. *Output Systems, Inc.*, 100 Conn. App. 143, 148, 917 A.2d 605, cert. denied, 282 Conn. 917, 925 A.2d 1099 (2007). "Whether there has been [a mutual] mistake is a question of fact." *Inland Wetlands & Watercourses Agency* v. *Landmark Investment Group, Inc.*, 218 Conn. 703, 708, 590 A.2d 968 (1991). "The remedy of reformation is appropriate in cases of mutual mistake— that is where, in reducing to writing an agreement made or transaction entered into as intended by the parties thereto, through mistake, common to both parties, the written instrument fails to express the real agreement or transaction. . . . In short, the mistake, being com-

mon to both parties, effects a result which neither intended." (Citations omitted; internal quotation marks omitted.) *Lopinto* v. *Haines*, 185 Conn. 527, 532, 441 A.2d 151 (1981).

The plaintiff sought reformation of the contract on the ground of mutual mistake. The court noted that "[t]he assumption underlying the plaintiff's argument is that both parties were mistaken in their mutual belief that the defendants owned all of the property to the mean high waterline." The trial court rejected the plaintiff's claim. The court reasoned that, although it was the parties' intent to contract for the sale of property to the mean high waterline, there was no evidence presented to the court that the defendants did not own the property to the mean high waterline. Rather, the better evidence demonstrated that the defendants owned the property to the current mean high waterline, through the doctrine of accretion, and that, had the plaintiff accepted the deed or deeds the defendants were willing to provide, the plaintiff would have owned the property to the current mean high waterline. The court further found that Chute was aware of the doctrine of accretion and had explained to the plaintiff that the property had been expanded by accretion.

The plaintiff argues that the court erred in characterizing the claimed mutual mistake as a mutual belief that the defendants owned all the property to the mean high waterline. The plaintiff contends rather that the mutual mistake was that both parties had mistakenly believed that the property description in schedule A included the full extent of the property to the current mean high waterline. In other words, the mutual mistake was that both parties believed that the defendants owned marketable title to the property beyond the 591 line to the current mean high waterline. Schedule A, however, expressly described the property as bound on the west by the 591 line. The plaintiff argues that because the court misinterpreted the plaintiff's claim regarding what constituted the mutual mistake, its conclusion that the plaintiff did not satisfy his burden was clearly erroneous.

The court, however, did address the claim that the parties intended to convey marketable title to the entire property, including that portion west of the 591 line to the current mean high waterline. In ruling on the plaintiff's motion for reargument and reconsideration as to the breach of contract claim, the court stated: "The plaintiff seeks to twist the finding of the court into a finding that it was the intent of the parties to contract for the conveyance of *marketable title* to all the property to the mean high waterline. The court made no such finding and, in fact, the better evidence is that the parties in their discussions prior to execution [of] the contract did not consider the nature of the title to be conveyed." (Emphasis in original.) Because the

court found that the parties did not consider the precise nature of title to be conveyed, the plaintiff did not sustain his burden as to his claim of mutual mistake. On the record provided to us, the court's conclusion that the plaintiff had not proved a mutual mistake is not clearly erroneous.

## IV

The plaintiff next claims that the court erred in concluding that he did not prove the counts alleging fraudulent misrepresentation, innocent misrepresentation and negligent misrepresentation as against Chute. We disagree.

This court reviews findings of misrepresentation under the clearly erroneous standard. *McClintock* v. *Rivard*, 219 Conn. 417, 426–27, 593 A.2d 1375 (1991).

"To assert a claim for intentional misrepresentation or fraudulent inducement the buyers must prove that (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Biro* v. *Matz*, 132 Conn. App. 272, 288, 33 A.3d 742 (2011). "The elements of [innocent misrepresentation] are (1) a representation of material fact, (2) made for the purpose of inducing the purchase, (3) the representation is untrue, and (4) there is justifiable reliance by the plaintiff on the representation by the defendant and (5) damages." (Internal quotation marks omitted.) *Matyas* v. *Minck*, 37 Conn. App. 321, 333, 655 A.2d 1155 (1995). "Traditionally, an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Nazami* v. *Patrons Mutual Ins. Co.*, 280 Conn. 619, 626, 910 A.2d 209 (2006). "Liability for negligent misrepresentation may be placed on an individual when there has been a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance which imposes a duty to speak. . . . Such a duty is imposed on a party insofar as he voluntarily makes disclosure. A party who assumes to speak must make full and fair disclosure as to the matters about which he assumes to speak." (Internal quotation marks omitted.) *Johnnycake Mountain Associates* v. *Ochs*, 104 Conn. App. 194, 206, 932 A.2d 472 (2007), cert. denied, 286 Conn. 906, 944 A.2d 978 (2008).

The court determined that common elements of each of the misrepresentation claims were a material misrepresentation by Chute and justifiable reliance by the plaintiff on such misrepresentation. The court noted that the plaintiff asserted that Chute misrepresented

the property to be waterfront and misrepresented that he owned the property to the current mean high waterline. The court found that Chute made the representations, but that the plaintiff failed to sustain his burden of proving that the representations were false. The court noted that there was no evidence that the defendants did not own the property to the current mean high waterline and that the more persuasive evidence indicated that the defendants owned the property west of the 591 line; had the plaintiff completed the transaction, he would have owned the property to the current mean high waterline.[10] The court further concluded that the plaintiff had not proven justifiable reliance on any alleged misrepresentation because a simple comparison between the property description contained in the initial survey and that in the contract would have alerted the plaintiff to any discrepancy. The court further found that Chute, in representing that the property was waterfront and that he owned the property to the mean high waterline, did not represent the nature of his ownership in terms of marketable title or otherwise. The court found that in his discussions with the plaintiff, Chute was speaking in common parlance and said that he owned the property. The court found credible Chute's testimony that, prior to the execution of the contract, he would not have thought of or known of the nuances of marketable title.

The plaintiff argues that the court erroneously concluded that Chute's representations pertained only to ownership rather than to marketable title. He contends that, prior to the signing of the contract, the defendants provided him with a survey that depicted the western boundary as the current mean high waterline, as well as with other documents similarly depicting the property. The parties discussed water related amenities, including a dock, and incorporated such considerations into the contract in paragraph 38.[11] The plaintiff argues that he relied on such representations and entered into the contract believing that he was purchasing marketable title to the property to the current mean high waterline.

The plaintiff's claim hinges on the premise that Chute represented that he owned marketable title to the property to the west of the 591 line when he did not. The court, however, found the testimony of Chute credible in this regard. It found that Chute accurately represented that he owned the property to the mean high waterline, but he did not represent the nature of his ownership as marketable title or otherwise. The court's findings were not clearly erroneous, and it was within the exclusive province of the trial court, as the fact finder, to resolve questions of credibility. See, e.g., *Levy, Miller, Maretz, LLC* v. *Vuoso*, 70 Conn. App. 124, 130-31, 797 A.2d 574 (2002).

V

The plaintiff next claims that the court erred in

determining that Chute did not violate CUTPA. We disagree.

In his posttrial memorandum of law, the plaintiff argued that Chute was engaged in the business of selling and building residential homes and that his misrepresentations to the plaintiff regarding his ownership of the property and his refusal to return the plaintiff's deposit violated CUTPA. The trial court determined that the plaintiff failed to prove that Chute's conduct "in any way was a violation of CUTPA."

"[General Statutes §] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]omission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . ." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 409–10, 78 A.3d 76 (2013). "It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier" that we review under the clearly erroneous standard. *Russell* v. *Russell*, 91 Conn. App. 619, 646, 882 A.2d 98, cert. denied, 276 Conn. 924, 925, 888 A.2d 92 (2005).

The plaintiff's CUTPA claim incorporates and expands upon his claims regarding breach of contract and misrepresentation. We have concluded that the court properly rejected the plaintiff's claims for breach of contract and misrepresentation, on which the CUTPA claim was premised. Accordingly, we conclude that the court did not err in concluding that the plaintiff had not proved his CUTPA claim.

VI

The plaintiff's final claim concerns the court's award of attorney's fees to the defendants. On appeal, the plaintiff claims that the court erred in awarding to the defendants attorney's fees and disbursements. On cross appeal, the defendants claim that the court erred in reducing the amount of attorney's fees. We disagree with both contentions.

The defendants filed a motion for attorney's fees on the ground that the contract provided that the prevailing party was entitled to attorney's fees and that they were the prevailing parties in the litigation. Following the court's ruling on the plaintiff's motion for reargument/ reconsideration, the defendants filed a supplemental motion for attorney's fees on the same ground and added a claim for additional attorney's fees for litigating the plaintiff's motion for reargument/reconsideration. The court granted the defendants' motion for attorney's fees, and awarded $80,000 in attorney's fees and $741.35 in disbursements.

"The general rule of law known as the American rule is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception. . . . Connecticut adheres to the American rule. . . . There are few exceptions. For example, where a specific contractual term provides for the recovery of attorney's fees and costs . . . or where a statute controls." (Citations omitted; internal quotation marks omitted.) *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 311, 685 A.2d 305 (1996).

"A court has few duties of a more delicate nature than that of fixing counsel fees. The issue grows even more delicate on appeal; we may not alter an award of attorney's fees unless the trial court has clearly abused its discretion, for the trial court is in the best position to evaluate the circumstances of each case. . . . Because the trial court is in the best position to evaluate the circumstances of each case, we will not substitute our opinion concerning counsel fees or alter an award of attorney's fees unless the trial court has clearly abused its discretion." (Citation omitted; internal quotation marks omitted.) *LaMontagne* v. *Musano, Inc.*, 61 Conn. App. 60, 64, 762 A.2d 508 (2000).

A

The plaintiff argues that the defendants are not entitled to attorney's fees pursuant to the contract because the contract provided that the *prevailing party* was entitled to recover reasonable attorney's fees and costs, and the defendants were not the prevailing party. The plaintiff argues that the only provision of the contract that the defendants sought to have enforced was the liquidated damages clause; the court, in its decision on the plaintiff's motion for reargument/reconsideration, found in favor of the plaintiff on the unjust enrichment

count and declined to enforce the liquidated damages provision.[12] We are not persuaded, in part because the defendants have prevailed in this court on their claim that the liquidated damages clause is enforceable in its entirety.

The contract provides in paragraph 29: "Except as otherwise expressly provided herein, in the event of any litigation brought to enforce any material provision of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and court costs from the other party." The contract did not specify that the prevailing party must also have been the party seeking to enforce a material provision, but rather in more general terms provided for attorney's fees to the prevailing party in the event that "any litigation" is brought to "enforce any material provision of this Agreement . . . ." The present case clearly qualifies as "any litigation," which sought the enforcement of a material provision of the contract. The defendants prevailed insofar as they successfully defended against the plaintiff's claim that they had breached paragraph 6 (a) of the contract by not delivering good and marketable title. "A prevailing party is one in whose favor a judgment is rendered, regardless of the amount of damages awarded." (Internal quotation marks omitted.) *Yeager* v. *Alvarez*, 134 Conn. App. 112, 123, 38 A.3d 1224 (2012). Moreover, the defendants have successfully contended on appeal that they were entitled to keep the full amount of the deposit. Although the matter was perhaps a "split decision" in the trial court, it was within the court's discretion to determine that the defendants were, on the whole, "prevailing."

B

In their postjudgment motions for attorney's fees, the defendants sought $138,642 in attorney's fees and $741.35 in disbursements. In its decision on the defendants' motion for attorney's fees, the court addressed the plaintiff's objections, which included arguments that the defendants' attorney spent some of his time on the defendants' counterclaim on which the defendants did not prevail; he did not spend all of his time defending the breach of contract claim. The plaintiff also argued that the hourly rate sought by the defendants' attorney, between $520 and $540 an hour, was greater than the prevailing rate. The court determined that it would be impractical to apportion the time spent on the various claims and the counterclaim because evidence and time spent were not clearly assignable to discrete claims and the counterclaim. The court observed that the head of the litigation department at the law firm of the plaintiff's counsel testified that the prevailing rate for the type of litigation involved in the present case was between $300 and $425 per hour and that the rates charged by the defendants' counsel were considerably above the prevailing rate. The court found

that the hourly rates charged by the defendants' counsel were outside the norm charged for this type of litigation, and determined that reasonable attorney's fees in the case were $80,000, and $741.35 in disbursements.

The defendants argue in their cross appeal that the court should have awarded the amount of attorney's fees requested for the trial portion of the case, which was $138,642, and that it erred in reducing the attorney's fees portion of the award to $80,000. They contend that the key factor in the reduction was the court's finding that the hourly rates charged by the defendants' counsel were higher than typical rates charged. The defendants argue that the plaintiff's counsel, who testified as to typical market rates, readily acknowledged that his office rates were below market. The defendants further argue that their attorney spent fewer hours working on the litigation than the plaintiff's multiple attorneys and that efficiency should have been considered in determining the hourly rate.

"If a contractual provision allows for reasonable attorney's fees, [t]here are several general factors which may properly be considered in determining the amount to be allowed as reasonable compensation to an attorney. These factors are summarized in [rule 1.5 (a) of the Rules of Professional Conduct]. . . . These factors include: the time and labor required; the novelty and difficulty of the questions involved; the skill requisite to perform the legal service properly; the fee customarily charged in the locality for similar legal services; the amount involved and the results obtained; the time limitations imposed by the client; the experience, reputation and ability of the lawyer or lawyers performing the services, and whether the fee is fixed or contingent. Rules of Professional Conduct 1.5 (a). The commentary to rule 1.5 provides that the factors specified in the rule, however, are not exclusive. [W]e have explained previously courts . . . may rely on their general knowledge of what has occurred at the proceedings before them to supply evidence in support of an award of attorney's fees." (Citations omitted; internal quotation marks omitted.) *WiFiLand, LLP* v. *Hudson*, 153 Conn. App. 87, 102–103, 100 A.3d 450 (2014).

The court considered relevant factors and acted within its discretion in determining that reasonable attorney's fees were $80,000. The defendants challenge the court's finding regarding a reasonable market rate for the services of their counsel. The head of the litigation department at the law firm of the plaintiff's trial counsel testified that his firm tried to set hourly rates that were "comparable" to the ranges generally charged by litigators in the Stamford-Norwalk judicial district but perhaps were "a little bit more reasonable . . . than [those of] most law firms . . . ." The trial court reasonably could have found that the extent to which the rates were a "bit more reasonable" was minimal or

immaterial. At any rate, we do not conclude that the court's finding that the hourly rates of the defendants' counsel were above market average was a manifest abuse of its discretion. "[I]t is not an abuse of discretion for a court to apply local market rates. Thus, a renowned lawyer who customarily receives $250 an hour in a field in which competent and experienced lawyers in the region normally receive $85 an hour should be compensated at the lower rate." (Internal quotation marks omitted.) *Stokes* v. *Norwich Taxi, LLC*, 289 Conn. 465, 495–96, 958 A.2d 1195 (2008) (rejecting plaintiffs' claim that trial court abused discretion in failing to apply current hourly rate of plaintiff's counsel and holding that trial court properly applied its broad discretion to apply local market rate).

The judgment is reversed only as to the unjust enrichment count and the case is remanded with direction to render judgment on that count in favor of the defendants. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The plaintiff dealt primarily with the Chute.

[2] "Accretion is defined as [a]ddition of portions of soil, by gradual deposition through the operation of natural causes, to that already in possession of the owner. . . . [T]he owner of waterfront property is benefited in title by whatever may be joined to his land, above the high-water mark, through accretion." (Citations omitted; internal quotation marks omitted.) *Roche* v. *Fairfield*, 186 Conn. 490, 495, 442 A.2d 911 (1982).

[3] "Pursuant to the [Marketable Title Act (act), General Statutes § 47-33b et seq.], any person who has an unbroken record chain of title to an interest in land for a period of forty years, plus any additional period of time necessary to trace the title back to the latest connecting title instrument of earlier record (which is the root of title under the act) has a marketable record title subject only to those pre-root of title matters that are excepted under the statute or are caused to reappear in the latest forty year record chain of title. . . . The act declares null and void any interest in real property not specifically described in the deed to the property which it purports to affect, unless within a forty year period, a notice specifically reciting the clamed interest is placed on the land records in the affected land's chain of title." (Internal quotation marks omitted.) *Irving* v. *Firehouse Associates, LLC*, 95 Conn. App. 713, 724, 898 A.2d 270, cert. denied, 280 Conn. 903, 907 A.2d 90 (2006). It is, of course, possible to have unfettered title without having marketable title; here, of course, there technically was no root of title to the accreted land, yet, by law, it was "owned" by the owner of the preexisting abutting land.

[4] "[T]he parol evidence rule is not an exclusionary rule of evidence . . . but a rule of substantive contract law . . . to which we afford plenary review. . . . The rule is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages . . . in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. . . . Ordinarily, a merger clause provision indicates that the subject agreement is completely integrated, and parol evidence is precluded from altering or interpreting the agreement." (Citations omitted; internal quotation marks omitted.) *Weiss* v. *Smulders*, 313 Conn. 227, 248–49, 96 A.3d 1175 (2014).

[5] The contract contained, in paragraph 32, a merger clause indicating that the contract "completely expresses the agreement of the parties . . . ."

[6] There has been no suggestion in this court that the plaintiff would not have owned the accreted land after a closing. As stated previously, only "marketable title" could not be conveyed as to the accreted land.

[7] The defendants also argue that the court erred in determining that the plaintiff did not wilfully breach the contract. Because we agree with the defendants' other arguments, we need not address this claim.

[8] "We long have held that contracting parties may decide on a specified monetary remedy for the failure to perform a contractual obligation. . . . [A] liquidated damages provision that fixes the amount of damages to be paid in the event of a breach is enforceable if it satisfies certain conditions. . . . A provision for liquidated damages . . . is one the real purpose of which is to fix fair compensation to the injured party for a breach of the contract." (Citations omitted; internal quotation marks omitted.) *Federal National Mortgage Assn.* v. *Bridgeport Portfolio, LLC*, 150 Conn. App. 610, 620–21, 92 A.3d 966, cert. denied, 312 Conn. 926, 95 A.3d 523 (2014).

[9] Here, the court's analysis of damages, though gratuitous, illustrates the point of liquidated damages. The seller's actual damages as established by the court, though substantial, were approximately half of the amount of liquidated damages. The parties were, as the situation developed, somewhat fortunate, in that the subsequent sale of the property was consummated within a reasonably short time for a comparable (though somewhat lower) price. It is not difficult to imagine a different outcome: suppose the property had remained on the market for an extended period of time, so that the actual damages turned out to be many times the amount of liquidated damages. In sum, both sides, in agreeing upon a liquidated damages clause, incur benefits and risks, and we ought not lightly to disturb the bargain.

[10] In reaching this conclusion, the court referenced an opinion letter by the plaintiff's expert, a lawyer employed by a title insurance company, who stated that she had based her opinion on documentation provided by the defendants' real estate counsel. She opined that the defendants owned the property to the current mean high waterline, but neither she nor the defendants' real estate counsel opined that the defendants had marketable title to the mean high waterline. The court concluded that the conclusions reached by the plaintiff's expert and Chute's real estate counsel, which were that the defendants owned the property to the mean high waterline, was consistent with Connecticut law on the doctrine of accretion. See, e.g., *Roche* v. *Fairfield*, 186 Conn. 490, 495, 442 A.2d 911 (1982).

[11] See part I of this opinion.

[12] But see part II of this opinion.